AO 106 (Rev. 06/09)  Application for a Search Warrant

*FILED*

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Oklahoma

MAR 0 3 2022

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

| | |
|---|---|
| In the Matter of the Search of<br>A Silver Apple Iphone Currently Stored at<br>4944 S. 83rd East Avenue, Tulsa, Oklahoma. | )<br>)<br>)<br>)<br>) |

Case No. 22-mj-125-JFJ

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the __Northern__ District of __Oklahoma__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| **21 U.S.C. § 841(a)(1)** | **Distribution, Manufacture, and Possession With Intent to Distribute Controlled Substances** |
| **21 U.S.C. § 846** | **Drug Conspiracy** |

The application is based on these facts:

**See Affidavit of Task Force Officer William R. Mackenzie, attached hereto**.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
William R. Mackenzie, DEA Task Force Officer
*Printed name and title*

Sworn to before me via telephone.

Date: __3-3-22__

_____
*Judge's signature*

City and state: __Tulsa, OK__      Tulsa, Oklahoma

_____
Jodi F. Jayne, U.S. Magistrate
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **In the Matter of the Search of A Silver Apple Iphone Currently Stored at 4944 S. 83rd East Avenue, Tulsa, Oklahoma** | **Case No.** _____ <br><br> **FILED UNDER SEAL** |

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, William R. Mackenzie, being first duly sworn under oath, depose and state:

### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Task Force Officer with the Drug Enforcement Administration (DEA), United States Department of Justice, and as such, I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), and Title 21, United States Code, Section 878(a), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Titles 18 and 21 of the United States Code.  I am also a police officer for the Tulsa Police Department and have been so for over twenty one years.  I have a Bachelor's Degree in Criminal Justice from East Central

University. Since becoming a Narcotics Detective with the Tulsa Police Department,
I have participated in wire and physical surveillance, surveillance of undercover
transactions, the introduction of undercover agents, the execution of search warrants,
debriefings of informants and reviews of taped conversations and drug records.
Through my training, education and experience, I have become familiar with the
manner in which illegal drugs are transported, stored, and distributed and the
methods of payment for such drugs.  I have been the primary investigator in more
than five complex conspiracy cases prosecuted within the federal justice system. I
have trained other narcotic detectives within the Tulsa Police Department's Special
Investigations Division.  I have completed the Oklahoma State Bureau of
Investigations Clandestine Laboratory Basic Safety Certification and Clandestine
Laboratory Site Safety Officer courses presented by Network Environmental
Systems. I have completed the Drug Enforcement Administration Basic Narcotics
Investigator School. I have completed an Advanced Undercover Narcotics School. I
have completed a Southwest Border Intelligence school and an Outlaw Motorcycle
Gang school presented by the Association of Oklahoma Narcotic Enforcers. I have
completed a Complex Conspiracies school presented by the Midwest Counterdrug
Training Center. I have completed a Communication Exploitation Training
presented by the Drug Enforcement Administration Special Operations Division.  I
have received formal training in narcotics investigations from the Tulsa Police
Academy, as well as informal training received from more experienced officers. I
have participated in over 500 drug related criminal investigations. I have authored

2

federal Title III affidavits and both state and federal search warrants. I have participated in several Title III investigations, purchased narcotics in an undercover capacity on numerous occasions, and executed controlled deliveries of narcotics. I have interviewed hundreds of defendants involved in the use, manufacture, transportation, and illegal sale of controlled dangerous substances.   During the course of these interviews, I have inquired and learned how individuals involved in drug distribution schemes and networks use and disperse the illegal proceeds generated from the illegal sale of controlled dangerous substances, including but not limited to chemicals commonly utilized in the illegal manufacture of methamphetamine.

3. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, and conversations with others who have personal knowledge of the events and circumstances described herein. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

4. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of Title 21 U.S.C. §§ 846 and 841(a)(1) – Conspiracy and  Distribution, Manufacture, and Possession with Intent to Distribute Controlled Substances – will be located in the electronically stored

3

information described in Attachment B and is recorded on the device described in Attachment A.

## Identification of the Device to be Examined

5. The property to be searched is a Silver Apple iPhone, unknown serial number, hereinafter the "Device." The Device is currently located at the Tulsa Police Department Special Investigations Division evidence locker at 4944 S. 83rd East Avenue, Tulsa, Oklahoma.

6. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## Probable Cause

7. On February 10, 2022, members of the DEA, Homeland Security Investigations (HSI) and the Tulsa Police Department served a federal search warrant on a property located at 5051 N. Columbia Place in Tulsa, Oklahoma. A vehicle utilized by the Tulsa Police Department Special Operations team was used to breach a fence allowing investigators to enter the property. Investigators noticed that cameras were located on the corners of the residence. After investigators got to the front door, TFO Payton Laskey and I made several announcements, including "Police with a search warrant" and "Open the front door." After receiving no response from occupants inside, TFO Laskey breached the front door. I immediately noticed a Hispanic male, later identified as Jorge Martinez, and a Hispanic female

4

later, identified as Jessica Oronoz-Hernandez, standing in the living room. I noticed a large tray with several kilograms of suspected crystal methamphetamine was in the living room next to where both subjects were standing. Both subjects came to the front door and were placed in custody. Investigators entered the residence and no other suspects were located inside.

8. A search of the residence revealed an active methamphetamine conversion lab was operating within the residence. The residence consisted of three bedrooms with the northern bedroom being the only portion of the residence not containing methamphetamine lab components. The northern bedroom had a blowup mattress, women's clothing and a passport lying on the bed in the name of Jessica Oronoz-Hernandez.

9. In the living room I located numerous pots and buckets containing a tan and clear liquid lined up along the western wall, 5-gallon cans of acetone, igloo containers, respirator masks, numerous packages of mineral water, boxes containing numerous kilogram quantities of methamphetamine packaged for distribution and a large metal tray with a large quantity of crystal methamphetamine lying on it. A blowup mattress was in the middle of the living room.

10. In a small room next to the kitchen TFO Laskey and I located 10 empty bags labeled "Pijama Prime," which investigators identified as a drying agents for newborn pigs, 3 full Pijama Prime bags, a DHL box with a label on it in the name of Jorge Martinez, numerous empty containers of acetone and a bucket full of a brown substance.

5

11. In the hallway of the residence, I located numerous packages of mineral waters, pots, and 5-gallon containers of water.

12. In a bedroom south of the living room I located numerous pots sitting on burners with suspected liquid methamphetamine actively cooking, propane tanks, a large spoon with crystal methamphetamine all over it, a container with a tan crystal substance inside, and empty igloo coolers.

13. In the bathroom of the residence, I located a 5-gallon bucket with a clear liquid inside.

14. In the far southern bedroom I located 3 igloo coolers with tan crystal methamphetamine inside, cardboard on the floor with a large quantity of crystal methamphetamine on it, a large metal tray with a large quantity of crystal methamphetamine lying on it, numerous empty plastic containers, 2 digital scales next to a plastic container with a large quantity of methamphetamine in it and numerous kilogram-quantity plastic containers with crystal methamphetamine inside lying on the floor in the closet.

15. While searching the property, TFO Laskey and I located approximately 720 large brown paper sacks of Pijama Prime, each holding approximately 20 kilograms. The bags of Pijama Prime were located on pallets under a covered shed on the property. As previously mentioned, TFO Laskey and I noticed that 10 of the Pijama Prime bags were empty lying on the floor in the residence next to numerous empty containers of acetone and a bucket full of a brown substance. TFO Laskey conducted a field test on the brown substance within that bucket and received a

6

positive result for methamphetamine. TFO Laskey and I also noticed that there were 3 Pijama Prime bags containing powder in the same area of the residence. TFO Laskey conducted a field-test on powder inside one of those three bags and received a presumptive positive result for methamphetamine.

16. While searching the residence, I located a black Samsung cell phone on the kitchen counter. TFO Laskey located a silver Apple iPhone in Oronoz-Hernandez's front right pants pocket. Both cell phones are being maintained in the custody of the Tulsa Police Department.

17. TFO Shawn Sheridan and TFO Laskey conducted field tests on numerous items throughout the residence and received a presumptive positive for methamphetamine.

18. Agents located over 90 kilograms of crystal methamphetamine and over 70 gallons of liquid methamphetamine throughout the residence.

19. While on the property, TFO Andy Mackenzie and I started to interview Jessica Oronoz-Hernandez. Jessica Oronoz-Hernandez stated that she spoke English and would be willing to speak with investigators. I read Oronoz-Hernandez her Miranda rights and asked her to sign a rights waiver. Oronoz-Hernandez refused to sign the rights waiver so the interview was concluded.

19. The Device is currently in the lawful possession of the Tulsa Police Department Special Investigations Division. I was seized the device from Jessica Oronoz-Hernandez on February 10, 2022 and transported it to the evidence locker there on that day.

7

20. The Device is currently in storage at Tulsa Police Department Special Investigations Division evidence locker at 4944 S. 83rd East Avenue, Tulsa, Oklahoma. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Tulsa Police Department.

## Technical Terms

21. Based on my training and experience, I use the following technical terms to convey the following meanings:

22. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information

8

from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

23. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

24. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

25. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices

9

and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

26. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

27. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

28. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### Electronic Storage and Forensic Analysis

29. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

30. Your affiant knows that cellular telephones are often equipped with digital cameras and those phones possess the capability to transmit and/or store electronic images. Your affiant knows that in many cases, cellular telephones maintain photographs of illegal activities to include evidence of illegal drug trafficking. These photos are sometimes stored in their cellular phones and often are transmitted or sent from one electronic media device to another. Your affiant also knows that cellular phones may also contain notes regarding potential illegal acts that are recorded by the subject who possesses the electronics. Furthermore, your affiant knows that text messages, emails are often used by two or more persons to communicate information regarding illegal activities, between principals and co-conspirators of those crimes.

31. Your affiant knows that cellular telephones are utilized by the majority of individuals in the United States and have become a staple of communication

11

between individuals using text messaging, visual and audible communications (telephone calls and FaceTime type communications) as well as applications like "Whatsapp." Additionally, individuals utilize their cellular devices to take pictures, keep notes, as a GPS (global positioning System) device, and even to conduct illicit or illegal activity. Communications on phones are kept for long periods and transferred from one phone to another when replaced. This is done through the use of cloud storage and direct transfer conducted at the time of purchase or by the individual themselves. Individuals utilize this method as not to lose data that is stored on the phone such as contacts, photos, notes, and other important information to the individual. This data includes contacts used to conduct illegal activities to include drug trafficking.

32. Based on my education, training, and experience, I know that individuals involved in the use, sales, manufacturing, and transportation of illegal narcotics often use cell phones and other electronic devices to further their trade by conducting business on them via text messages and phone calls. I also know from my training, education, and experience that:

    a. Drug distributors/traffickers commonly maintain books, records, receipts, notes, ledgers, and other documents/papers both electronically and in paper form, which relate to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code and/or identify customers/sources/co-conspirators through monikers/nicknames. Documentation such as this oftentimes results

12

because drug distributors/traffickers commonly "front" drugs (provide
controlled substances on consignment) to their clients and must account for
these transactions in order to collect outstanding drug debts.

b. Drug distributors/traffickers commonly maintain addresses or telephone
numbers in notebooks, papers, cellular phones, computers and electronic
storage media which reflect names, address, and/or telephone numbers for
their associates in the drug distribution/trafficking organization, even if
said items may be in code, and such traffickers send and receive items
listed in this affidavit by mail and other common carriers.

c. Drug users, distributors and traffickers frequently take, or cause to be taken
photographs or videotapes of themselves, their associates, their
property/assets, and their product, and these individuals usually maintain
these photographs or recordings/videos in the residences under their
control. These photographs and videos are also often found in the
individual's cellular telephone, computers and other electronic storage
media.

d. Cellular telephones are often used to facilitate offenses and allow criminals
to maintain communication with each other before, during and after the
commission of offenses. I am aware that cellular telephones have the
capacity to store a vast amount of information, including but not limited
to: telephone numbers, voice messages, text messages, e-mail,
photographs, videos, address books, records, phone call histories, contact

13

and other information. This information may be contained on the cellular telephone.

e. Text messages and e-mails are often used by two or more persons to communicate information regarding illegal activities between two telephones or between one telephone and a personal computer. This information can include directions for deliveries, stash locations, prices, cell phone contact numbers, and instructions.

f. Cellular telephones often contain stored phone numbers and contact information of individuals that conduct business with other co-conspirators that possess the cellular telephone.

g. When drug users/dealers/traffickers use text messages to discuss topics such as quantities, prices, and the quality of controlled dangerous substances, as well as dates, times and locations for drug transactions, these communications are often in coded drug talk/jargon and require review by peace officers experienced in deciphering such communications.

h. In my experience in searching cellular telephones possessed by known drug users/distributors/traffickers, photos and/or videos have been discovered which evidence the use and distribution of controlled dangerous substances and the proceeds intended for or derived therefrom. This evidence often depicts pictures/videos of drugs for showing drug quality, condition or quantity. Moreover, users will commonly document episodes of drug use in social settings. Additionally, drug distributors will take pictures

14

("trophy" pictures) or otherwise capture digital recordings for the purpose of memorializing their credibility/capability as a drug dealer and accomplishments (acquisition of assets/large amounts of U.S. currency) relating thereto.

i.   In all phases of drug distribution, the utilization of cellular telephones is essential. Drug users/dealers/traffickers use cellular telephones to place calls, as well as communicate by SMS text messaging. As drug dealing necessarily entails constant communications with accomplices, co-conspirators, clients, and sources, these communications virtually always take place by voice calls and text messaging over cellular telephones.

j.   Cellular telephones are almost always used by drug distributors as a way to communicate. They will communicate by verbal conversations, digital text messaging, and/or sending photographs to one another. To avoid detection, drug distributors will oftentimes speak in coded language or through use of vague messages. Sometimes the cellular telephone numbers they use are listed in a different individual's name or they will frequently change phone numbers. Drug distributors will often "drop" or switch cellular phones to avoid detection by law enforcement. This will result in the accumulation of several different cellular phones.

33.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence

15

that establishes how the Device was used, the purpose of its use, who used it, and

when. There is probable cause to believe that this forensic electronic evidence might

be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

16

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

34. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

35. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

### Conclusion

36. Based on the information above, affiant submits that there is probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

37. Affiant requests to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters,

17

and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

William Mackenzie
Task Force Officer DEA

Subscribed and sworn to me via telephone on this 3rd day of March, 2022

JODI F. JAYNE
UNITED STATES MAGISTRATE JUDGE

18

## ATTACHMENT A

### Property to Be Searched

1. The property to be searched is a Silver iPhone, unknown serial number, unknown IMEI, hereinafter the "Device." The Device is currently located at Tulsa Police Department Special Investigations Division, 4944 S. 83rd East Avenue, Tulsa, Oklahoma.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.



## ATTACHMENT B

### Particular Things to be Seized

All records on the Device(s) described in Attachment A that relate to the unlawful drug conspiracy, possession with intent to distribute, distribution, and manufacture in violation of Title 21, United States Code, Sections 841 and 846 involving Jessica Oronoz-Hernandez, including:

1. Records relating to communication with others as to the criminal offenses listed above; including incoming and outgoing voice messages; text messages; emails; multimedia messages; applications that serve to allow parties to communicate; all call logs; secondary phone number accounts, including those derived from Skype, Line 2, Google Voice, Whatsapp, and other applications that can assign roaming phone numbers; and other Internet-based communication media;

2. Records relating to documentation or memorialization of the criminal offense(s) listed above, including voice memos, photographs, videos, and other audio and video media, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos, including device information, geotagging information, and information about the creation date of the audio and video media;

3. Records relating to the planning and execution of the criminal offense(s) above, including Internet activity, firewall logs, caches, browser history, and cookies, "bookmarked" or "favorite" web pages, search terms that the user

entered into any Internet search engine, records of user-typed web addresses, account information, settings, and saved usage information;

4. Application data relating to the criminal offense(s) above;

5. Lists of customers and related identifying information;

6. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

7. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information); and

8. All bank records, checks, credit card bills, account information, and other financial records.

9. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history;

10. All records and information related to the geolocation of the Device;

11. All records and information related to the coordination, agreement, collaboration, and concerted effort of and with others to violate the criminal statutes listed above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been

3

created or stored, including any form of computer or electronic storage (such as flash

memory or other media that can store data) and any photographic form.

4